**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CONSUMER FINANCIAL PROTECTION
BUREAU,

*Plaintiff-Appellee*,

v.

CHANCE EDWARD GORDON, DBA
Gordon and Associates, DBA
National Legal Source, DBA
Resource Law Center, DBA
Resource Law Group, DBA
Resource Legal Group, DBA The
C E G Law Firm, DBA The Law
Offices of C. Edward Gordon, DBA
The Law Offices of Chance E
Gordon,

*Defendant-Appellant.*

No. 13-56484

D.C. No.
2:12-cv-06147-
RSWL-MRW

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
October 20, 2015—Pasadena, California

Filed April 14, 2016

Before: Sandra S. Ikuta and John B. Owens, Circuit Judges, and William K. Sessions,[*] District Judge.

Opinion by Judge Owens;
Dissent by Judge Ikuta

## SUMMARY[**]

### Standing / Appointments / Consumer Financial Protection Bureau

The panel affirmed in part, and vacated in part, the district court's summary judgment in favor of the Consumer Financial Protection Bureau in its civil enforcement action for violations of the Consumer Financial Protection Act ("CFPA") and Regulation O against Chance Gordon.

On January 4, 2012, President Obama, relying on his recess-appointment power, named Richard Cordray as the Bureau's initial Director; and he renominated Cordray as Director on January 24, 2013, and the Senate confirmed him on July 16, 2013. The Bureau filed this action against Gordon in July 2012.

The panel held that Cordray's improper recess reappointment, pursuant to *NLRB v. Noel Canning*, 134 S. Ct.

---

[*] The Honorable William K. Sessions III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

2550, 2556–57 (2014), did not divest this court of jurisdiction because the Bureau, as an agency of the Executive Branch, had an interest or power in having federal law enforced, and there was Article III standing. The panel also held that the initial invalid recess appointment of Cordray was not fatal to the case, because the subsequent valid appointment, coupled with Cordray's Senate confirmation, cured any Article II Appointments Clause deficiencies.

The panel held that Gordon failed to demonstrate that there was any dispute of material fact as to his liability under the CFPA or Regulation O, and therefore, the district court properly granted summary judgment in favor of the Bureau. The panel also held that because the district court conscientiously tailored the injunction at issue, it did not abuse its discretion in granting equitable judgment to the Bureau. The panel further held, however, that because the district court may have impermissibly entered a monetary judgment against Gordon for a time period prior to the enactment or effective date of the relative provisions of the CFPA and Regulation O, the case was remanded for further consideration of the monetary judgment.

Judge Ikuta dissented. She would hold that the Bureau lacked executive power to bring the civil enforcement action because Richard Cordray was not properly appointed at the time the action was filed, and therefore there was no Article III standing, and the district court was bound to dismiss the action.

**COUNSEL**

Gary Kurtz, Law Office of Gary Kurtz, PLC, Woodland Hills, California, for Defendant-Appellant.

Meredith Fuchs, General Counsel; To-Quyen Truong, Deputy General Counsel; John R. Coleman, Assistant General Counsel; Nandan M. Joshi and Kristin Bateman (argued), Attorneys, Consumer Financial Protection Bureau, Washington, D.C., for Plaintiff-Appellee.

Charles J. Cooper (argued), David H. Thompson, Howard C. Nielson, Jr., and John D. Ohlendorf, Cooper & Kirk, PLLC, Washington, D.C., for Amicus Curiae Judicial Education Project.

**OPINION**

OWENS, Circuit Judge:

Appellant Chance Gordon appeals from the district court's order of summary judgment in favor of the Consumer Financial Protection Bureau (CFPB) on its enforcement action for violations of the Consumer Financial Protection Act and Regulation O. We affirm in part, and vacate and remand in part, for reconsideration of the monetary judgment in accordance with this opinion.

## I. BACKGROUND

### A. Gordon's Loan Modification Program

Gordon, a licensed California attorney, was the sole owner and officer of the Gordon Law Firm (collectively Gordon), and provided home loan modification services. Due to changes in the law that prohibited charging up-front for these services, Gordon created the "Pre-Litigation Monetary Claims Program" (Program). In the Program, Gordon, for a flat fee, would prepare certain legal "products" advertised to help purchasers in their disputes with the lenders that owned their mortgages.

Gordon also created an attorney-client "pro bono" legal agreement, where he promised to provide certain legal services free of charge, including negotiating with the lenders to modify mortgages. Clients could receive these "pro bono" services only if they paid for the Program. Previously, Gordon charged clients for these same legal services.

To attract clients, Gordon hired Abraham Pessar to perform marketing and advertising services.[1] Pessar sent direct mail marketing pieces to financially distressed homeowners. In early 2010, Pessar and his team began sending out a mailer titled "Notice of HUD Rights," which bore a Washington, D.C. return address to which neither Gordon nor Pessar had any personal or business connection. The mailer stated that it was provided "[c]ourtesy of the Qualification Intake Department," and that the recipient could have the right to participate in a repayment program that could prevent future foreclosure proceedings.

In June 2011, Pessar and his team created a new mailer labeled "Program: Making Homes Affordable," which closely resembled the federal government's "Making Home Affordable Program" (though the mailer disclaimed any affiliation with the government). Pessar's team also used websites and telephone calls to solicit consumers. Pessar claimed that Gordon reviewed and approved all marketing materials, while Gordon disputed his involvement and control over the mailers, websites, and telephone calls.

---

[1] The enforcement action at issue here was filed against Chance Gordon, the "Gordon Entities," Abraham Pessar, and the "Pessar Entities." The entities included various businesses and corporations owned and operated by Gordon and Pessar. For simplicity, we will refer herein to Gordon and his entities collectively as "Gordon" and Pessar and his entities as "Pessar." Pessar and his entities are no longer defendants in the suit, as they settled with the government in January 2013.

**B. The Appointment (and Eventual Confirmation) of Richard Cordray as Director of the CFPB, and His Ratification of Past Acts**

On January 4, 2012, President Obama, relying on his recess-appointment power, named Richard Cordray as the CFPB's initial Director. *See* U.S. Const. art. II, § 2, cl. 3.[2] That same day, he appointed three individuals to the National Labor Relations Board (NLRB) in similar fashion. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2556–57 (2014). In *Noel Canning*, the Supreme Court held that the NLRB appointments did not satisfy Article II's Appointment Clause requirements, as they did not occur when the Senate was out of session. *Id.* at 2574–77.

President Obama renominated Cordray as Director on January 24, 2013. *See* White House Office of the Press Secretary, *Remarks by the President at a Personnel Announcement* (Jan. 24, 2013), https://www.whitehouse.gov/the-press-office/2013/01/24/remarks-president-personnel-announcement. On July 16, 2013, the Senate confirmed Cordray as Director. 159 Cong. Rec. D704 (daily ed. July 16, 2013). On August 30, 2013, the CFPB issued the following Notice of Ratification, signed by Cordray:

> The President appointed me as Director of the Bureau of Consumer Financial Protection on January 4, 2012, pursuant to his authority under the Recess Appointments Clause, U.S.

---

[2] The relevant clause provides: "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

> Const. art. II, § 2, cl. 3. The President subsequently appointed me as Director on July 17, 2013, following confirmation by the Senate, pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. I believe that the actions I took during the period I was serving as a recess appointee were legally authorized and entirely proper. To avoid any possible uncertainty, however, I hereby affirm and ratify any and all actions I took during that period.

Notice of Ratification, 78 Fed. Reg. 53734-02 (Aug. 30, 2013). The parties agree that while Cordray's initial January 2012 recess appointment was invalid, his July 2013 confirmation was valid. They disagree as to the significance of these events and the August 2013 ratification.

## C. The CFPB Litigation Against Gordon

In July 2012, the CFPB filed a civil enforcement action against Gordon, alleging that he violated two sections of the Consumer Financial Protection Act (CFPA) (12 U.S.C. §§ 5531, 5536) through unfair and deceptive practices—namely, suggesting that consumers would likely receive mortgage relief and that his operation was affiliated with the government. It also alleged that Gordon violated Regulation O (12 C.F.R. §§ 1015.1–11) by (i) receiving up-front payments for mortgage relief services before consumers entered into loan modification agreements with their lenders, (ii) failing to make the proper disclosures while communicating with consumers, (iii) advising consumers not to communicate with their lenders, and (iv) misrepresenting material aspects of his services. As relief, the CFPB sought

a permanent injunction to prevent future violations, restitution, and disgorgement of compensation. The CFPB also filed an ex parte application for a temporary restraining order that would (a) prohibit Gordon from operating his business, (b) appoint a receiver, and (c) freeze his assets. The district court issued the TRO and later a preliminary injunction.

After receiving cross-motions for summary judgment, the district court in June 2013 ruled in the CFPB's favor. It concluded that Gordon violated the CFPA in numerous ways, including by representing that the Program would benefit his clients (it actually left them in a far worse position), and that his business was somehow affiliated with the government (it was not). It held that Gordon violated Regulation O for the reasons that the CFPB alleged. It also ordered $11,403,338.63 in disgorgement and restitution against Gordon and the Gordon entities, jointly and severally. This represents the amount that Gordon and Pessar collected from consumers from January 2010 through July 2012.

The district court chose not to address the merits of Gordon's argument that the CFPB lacked authority to bring the action because its director, Cordray, was unconstitutionally appointed per *Noel Canning*. The district court concluded that Gordon had waived it by failing to articulate how Cordray's invalid appointment would prevent the CFPB from prosecuting civil enforcement actions. Gordon then appealed, and amicus Judicial Education Project (JEP) filed a brief that more extensively discussed the possible Article II and III consequences of Cordray's failed recess appointment.

## II.  STANDARD OF REVIEW

This court reviews questions of constitutional law de novo.  *Bojnoordi v. Holder*, 757 F.3d 1075, 1077 (9th Cir. 2014).  We review a district court's grant of summary judgment de novo and may affirm on any ground supported by the record.  *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008).  A district court's determination that a party waived an issue is reviewed for an abuse of discretion.  *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998).  We review for an abuse of discretion a district court's grant of equitable monetary and injunctive relief.  *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014).

## III.  ANALYSIS

### A.  Article III Standing

We begin by addressing whether we have jurisdiction to hear this case.  Although Gordon did not argue Article III standing to the district court, we have the obligation to ensure that it exists.  *See WildEarth Guardians v. EPA*, 759 F.3d 1064, 1070 (9th Cir. 2014) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

"[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818

(1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).  Consistent with this checks and balances principle, a private party can bring a "case" only if it has standing—"a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citing *Lujan*, 504 U.S. at 560–61).  A generalized grievance is not enough; a plaintiff must have more than merely an interest in seeing the law obeyed.  *FEC v. Akins*, 524 U.S. 11, 23–24 (1998); *see also Lujan*, 504 U.S. at 572–78.

As part of our separation of powers foundation, the Executive Branch is charged under our Constitution with the enforcement of federal law.  "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."  *Lujan*, 504 U.S. at 576 (emphasis in original); *see also* U.S. Const. art. II, § 3 (providing that the President has the duty to "take Care that the Laws be faithfully executed").  Thus, all parties (and JEP) agree that the Executive Branch and its duly appointed officers are excepted from the generalized grievance prohibition that private parties face under Article III.

CFPB brought the suit in question to vindicate, as codified by Congress, the public interest in making Gordon's victims whole and preventing him from further fleecing vulnerable homeowners.  Under *Lujan*, it is the Executive Branch, not any particular individual, that has Article III standing.   504 U.S. at 576; *see also United States v. Providence Journal Co.*, 485 U.S. 693, 700 (1988).

JEP argues that Cordray's improper recess appointment divests our court of jurisdiction. According to JEP, the lack of a valid director from the outset means that the CFPB never existed for Article III purposes until July 2013, when the Senate confirmed Cordray, because the CFPB purportedly could only operate with a properly confirmed director in place. Not only did Cordray lack authority to initiate any civil enforcement actions, the argument goes, but so did any inferior officers that Cordray appointed—essentially an Article II version of the fruit of the poisonous tree doctrine. To make this unpredecented argument, JEP points to *Hollingsworth* for support.

In *Hollingsworth*, same-sex couples sued California officials, alleging that Proposition 8, which banned same-sex marriage, violated their constitutional rights. 133 S. Ct. at 2659–60. The state officials refused to defend the law in court (though they continued to enforce it), and the district court permitted the original proponents of Proposition 8 to intervene and defend it. *Id.* at 2660. After a bench trial, the district court ruled in the plaintiffs' favor, struck down Proposition 8, and enjoined California officials from enforcing the law. *Id.*

The California officials declined to appeal the case, but the intervenors did. *Id.* Our court wondered whether the intervenors had Article III standing, and asked the California Supreme Court via certified question if the intervenors possessed either a particularized interest in Proposition 8's validity or the authority to assert the State's interest to defend it. *Id.* The California Supreme Court replied that the intervenors could assert the State's interest to defend the measure, but did not address whether the intervenors had their own particularized interest in its validity. *Id.* Concluding

that the intervenors had the requisite standing, our court then reached the merits and struck down Proposition 8. *Id.* at 2660–61.

In a 5–4 decision, the Supreme Court dismissed the case for lack of Article III standing. *Id.* at 2668. Citing *Lujan*, the Court explained that the intervenors had no direct stake in the litigation, but merely a "generalized grievance." *Id.* at 2662. Although they were proponents of the measure prior to its enactment, they had "no role—special or otherwise—in the enforcement of Proposition 8" post-enactment. *Id.* at 2662–63. This was true even though they wished to assert California's interest in the litigation, as "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Id.* at 2663 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)) (alteration in original). JEP argues that because Cordray was improperly appointed, he was a "private citizen" similar to the intervenors in *Hollingsworth*, and therefore lacked Article III standing to bring the CFPB's suit against Gordon.

A straightforward reading of *Hollingsworth* confirms that it has no impact on this case (and not even the dissent reads it as JEP and Gordon do). Here, Congress authorized the CFPB to bring actions in federal court to enforce certain consumer protection statutes and regulations. *See* 12 U.S.C. § 5564(a)–(b) (authorizing the CFPB to "commence a civil action against" violators of federal consumer financial protection laws and "act in its own name and through its own attorneys in enforcing" the laws under its jurisdiction). And with this authorization, the Executive Branch, through the CFPB, need not suffer a "particularized injury"—it is charged under Article II to enforce federal law. *See Lujan*, 504 U.S.

at 576–77. That its director was improperly appointed does not alter the Executive Branch's interest or power in having federal law enforced (and neither JEP nor Gordon point to any statute or regulation suggesting otherwise). While the failure to have a properly confirmed director may raise Article II Appointments Clause issues, it does not implicate our Article III jurisdiction to hear this case. *See Providence Journal*, 485 U.S. at 700 (explaining that, even though the special prosecutor who filed for a writ of certiorari was not properly authorized to act on behalf of the United States government, the case still "clearly is one in which the United States is interested" (internal quotation marks omitted)).

If the CFPB, as an agency, had lost before the district court and decided not to appeal, and a concerned citizen wanted to intervene and bring the appeal, then *Hollingsworth* would have relevance. That citizen, like the Proposition 8 intervenors, would be asserting nothing more than a passionate but generalized grievance. But the CFPB, as part of the Executive Branch, has never abandoned this lawsuit. And because the Executive Branch need not demonstrate a particularized injury, there is no *Hollingsworth* problem. *See, e.g.*, *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 n.4 (9th Cir. 2000) (noting that a lawsuit allegedly filed without authorization does not result in the district court "lack[ing] subject matter jurisdiction in the sense that it would if plaintiffs lacked standing to sue under the 'case or controversy' requirement of Article III of the Constitution").

*Providence Journal* offers further support. The Court dismissed that case because the special prosecutor lacked authority to file the petition for certiorari. 485 U.S. at 699–700. The Court never cast that lack of authority as an Article III standing problem—"in fact," *Providence Journal*

"[does] not discuss standing at all." *Hollingsworth*, 133 S. Ct. at 2655. Instead, the Court explained that the "action was initiated in vindication of the 'judicial power *of the United States*,' U.S. Const., Art. III, § 1 (emphasis added), and it is that interest, unique to the sovereign, that continues now to be litigated in this Court." *Providence Journal*, 485 U.S. at 700. The Court thereby confirmed that any issue with an individual's authorization to continue prosecuting the case did not strip the United States of its Article III interest in bringing the action. The dissent Bass-O-Matics the CFPB's authority to execute the laws (Article II) with the United States' interest in the case (Article III). The initially flawed appointment of Cordray is an Article II question, and every court confronted with this issue has analyzed it as such. *See, e.g.*, *Freytag v. Commissioner*, 501 U.S. 868, 878–79 (1991); *Buckley v. Valeo*, 424 U.S. 1, 137–42 (1976); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 705–06 (D.C. Cir. 1996).

Our holding tracks the cases in which the Supreme Court has described Appointments Clause questions as "nonjurisdictional," even though they implicate core separation of powers principles. For instance, in *Freytag*, the Supreme Court examined whether the appointment of an Article I court special tax judge satisfied the Appointments Clause. 501 U.S. at 877. Even though that case, like ours, involved important separation of powers issues "embedded in the Appointments Clause," the Court classified the issue as "nonjurisdictional." *Id.* at 878–79; *see also id.* at 893–94 ("A party forfeits the right to advance on appeal a nonjurisdictional claim, structural or otherwise, that he fails to raise at trial.") (Scalia, J., concurring in the judgment); *Buckley*, 424 U.S. at 142 (stating that violations of Appointments Clause did not negate past actions of Federal Election Commission).

*Buckley* exemplifies this fundamental principle.   The Supreme Court in *Buckley* held that the Federal Election Campaign Act violated the Appointments Clause, as it permitted congressionally appointed FEC Commissioners to discharge functions (including civil enforcement in federal court) reserved only for "Officers of the United States." *Buckley*, 424 U.S. at 137–41.  Under Gordon and JEP's view, this violation would raise irreparable Article III standing problems, as these Commissioners (much like Cordray) lacked the authority to take any steps on behalf of the FEC, rendering any actions involving Article III litigation a nullity. Rather than invalidate the FEC's prior actions, the Court instead accorded the Commission's prior acts "de facto validity" and granted a stay to allow Congress to take steps to rectify the Article II problem and avoid "interrupting enforcement" of the FECA's valid provisions.  *Id.* at 142–43.

Nowhere in *Buckley* did the Court suggest that the Article II problems rendered the FEC a nullity for Article III purposes, even though the Court discussed Article III earlier in its opinion.  *See id.* at 117–18.  If Gordon and JEP were correct, then the Court in *Buckley* would not have stayed anything—rather, it would have entered an order dismissing all FEC civil enforcement actions for lack of standing.  When confronted with a similar Article II problem, the D.C. Circuit read the same passage in *Buckley* and rejected as "overstated" the argument that an Article II defect "necessarily voids all prior decisions" taken by FEC in civil enforcement actions. *See Legi-Tech*, 75 F.3d at 708.[3]

---

[3] The dissent's attempts to distinguish these cases miss the mark.  It reads the D.C. Circuit's opinion in *Buckley* to undermine the Supreme Court's holding in the same case, but then ignores the D.C. Circuit's own reading of *Buckley* in *Legi-Tech*, where the D.C. Circuit relies on *Buckley*

We agree with the D.C. Circuit's reading of Article II and *Buckley*. Indeed, neither Gordon nor JEP cite a single case—save for the inapplicable *Hollingsworth*—to support the argument that an Appointments Clause problem deprives our court of Article III jurisdiction. Nothing in *Noel Canning* suggests that Appointments Clause problems divest federal courts of jurisdiction. It is true that "any *sub silentio* assumption of jurisdiction in a case [by the Supreme Court] 'does not constitute binding authority' on the jurisdictional question." *Thompson v. Frank*, 599 F.3d 1088, 1090 n.1 (9th Cir. 2010) (quoting *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1363 (9th Cir. 1998)). At the same time, we cannot turn a blind eye to the fact that no court, including the Supreme Court, has ever suggested that Article II problems nullify Article III jurisdiction. Absent clear instruction from the Supreme Court, we will not hold so here.

---

to ratify prior enforcement actions originally instituted by an unconstitutionally composed FEC. Dissent at 41–42; *Legi-Tech*, 75 F.3d at 707. As for *Freytag*, we agree that the case "did not raise any question regarding standing." Dissent at 40. That is because "nonjurisdictional" Appointments Clause situations like these do not raise Article III issues.

Perhaps most telling, the dissent (like JEP and Gordon) cannot identify any authority that actually supports its position—that the United States' Article III interest in a case turns solely on the status of one of its officers.

## B. Appointments Clause[4]

The initial invalid appointment of Cordray also is not fatal to this case. The subsequent valid appointment, coupled with Cordray's August 30, 2013 ratification, cures any initial Article II deficiencies.[5]

We are not the first court to grapple with this issue. For example, in *Legi-Tech*, the FEC brought an enforcement action in federal court after finding probable cause that Legi-Tech violated election laws. 75 F.3d at 707. Even though the FEC was illegally constituted when it brought the action, it cured this problem when the newly constituted Commission re-approved the litigation decision. *Id.* at 708–09. The D.C. Circuit concluded that even if the subsequent FEC "review" was "nothing more than a 'rubberstamp,'" it still satisfied the Appointments Clause. *Id.* at 709.

---

[4] Because we conclude that there is Article III standing, we need not reach the question of whether ratification can cure a defect in Article III standing, which the dissent addresses. *See* Dissent at 43–44.

[5] We may address this issue even though the district court refused to resolve it because Gordon "properly raised" it in the district court. *O'Rourke v. Seaboard Surety Co.*, 887 F.2d 955, 957 (9th Cir. 1989). For an argument to be "properly raised," it "must be raised sufficiently for the trial court to rule on it." *Id.* Here, Gordon undoubtedly raised the argument that Cordray was invalidly appointed under the Appointments Clause and, as a result, the enforcement action against Cordray was invalid. As this is an issue of law that does not depend on any further development of the facts, we may exercise our discretion to address it. *See El Paso City of Tex. v. Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000); *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995).

We agree with the D.C. Circuit's approach.  In reviewing issues like these, the Supreme Court has looked to the Restatement of Agency.  *See FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) (question of ratification is "at least presumptively governed by principles of agency law"); *see also Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 212–13 (D.C. Cir. 1998) (applying Restatement of Agency to Appointments Clause issue), *superseded by statute on other grounds*, Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, *as recognized in SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70–71 (D.C. Cir. 2015).

Both Gordon and JEP recognize that for a ratification to be effective, "it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was made.*"  *NRA Political Victory Fund*, 513 U.S. at 98 (emphasis in original) (quoting *Cook v. Tullis*, 85 U.S. 332, 338 (1874)).  This rule of law is derived from the Second Restatement of Agency. *See id.*  Under the Second Restatement, if the principal (here, CFPB) had authority to bring the action in question, then the subsequent August 2013 ratification of the decision to bring the case against Gordon is sufficient.  *See* Restatement on Agency (Second) § 84(1) ("An act which, when done, could have been authorized by a purported principal, or if an act of service by an intended principal, can be ratified if, at the time of the affirmance, he could authorize such an act."); *Legi-Tech*, 75 F.3d at 707, 709.  The Third Restatement, which is less "stringent" than the Second, *see* Restatement on Agency (Third) § 4.04 cmt. b, advises that a ratification is valid even if the principal did not have capacity to act at the time, so long as the person ratifying has the capacity to act at the time of ratification, *see id.* § 4.04(1) ("A person may ratify an act

if (a) the person existed at the time of the act, and (b) the person had capacity . . . at the time of ratifying the act."). For example, "if a personal representative has been appointed for a principal, the personal representative may ratify on behalf of the principal although the principal lacked capacity at the prior time of the act that is ratified." *Id.*, cmt. b.

As we discussed above in the section rejecting Gordon's Article III challenge, Congress authorized the CFPB to bring the action in question. *See* 12 U.S.C. § 5564(a)–(b). Because the CFPB had the authority to bring the action at the time Gordon was charged, Cordray's August 2013 ratification, done after he was properly appointed as Director, resolves any Appointments Clause deficiencies. *See* Restatement (Second) § 93(3) ("The affirmance can be made by an agent authorized so to do."); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 121 (D.C. Cir. 2015) ("[O]nce a new Board has been properly appointed (or reconstituted), the Appointments Clause does not bar it from reaching the same conclusion as its predecessor."); *Legi-Tech*, 75 F.3d at 707, 709 (writing that a newly constituted FEC need not "start at the beginning" and "redo the statutorily required procedures in their entirety").**[6]**

---

**[6]** Because we decide that Cordray's ratification of the enforcement action was effective, we need not address whether the original constitutional error is susceptible to harmless error review and, if so, whether the error here was harmless. We also need not decide whether the officials' decisions had de facto validity under the de facto officer doctrine. *See generally Ryder v. United States*, 515 U.S. 177 (1995).

**C.  Merits of Action Against Gordon**

Gordon alleges that the district court erred in granting summary judgment in favor of the CFPB on its claims that he violated (1) 12 U.S.C. §§ 5531 and 5536 of the CFPA by engaging in deceptive advertising (counts one through three) and (2) Regulation O (counts four through seven).

### a.  Counts One through Three: Violations of the CFPA, 12 U.S.C. §§ 5531, 5536

Section 5536(a)(1)(B) states that "[i]t shall be unlawful for (1) any covered person or service provider . . . (B) to engage in any unfair, deceptive, or abusive act or practice." *See also id.* § 5531(a) (stating that the CFPB may take action to "prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive practice under Federal law").  A "covered person" is "any person that engages in offering or providing a consumer financial product or service." *Id.* § 5481(6)(A).  Loan modification and foreclosure prevention services constitute "consumer financial product[s] or service[s]" under the statute. *Id.* § 5481(5), (15)(A)(viii)(II).

The district court concluded that Gordon falsely represented that (1) consumers would obtain mortgage loan modifications that would substantially reduce mortgage payments or interest rates, (2) he would conduct forensic audits that would substantially reduce mortgage payments, and (3) he was affiliated with, endorsed by, or approved by the United States government.  Gordon challenges these determinations on several grounds, all of which are unavailing.

First, Gordon argues that the district court erred in concluding at the summary judgment phase that his marketing materials deceptively suggested an affiliation with the United States government.    An act or practice is deceptive if: (1) "there is a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (citation omitted).[7]

Gordon does not argue that misleading consumers to believe that he was affiliated with the United States government would be immaterial, *see FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009), but instead asserts that the mailings were not deceptive.  "Deception may be found based on the 'net impression' created by a representation."  *Id.* (citation omitted).  Here, there can be no dispute that the net impression was deceptive.  The mailer bore the Equal Opportunity Housing logo, stated that it was a "Notice of HUD Rights," and that it was provided courtesy of the "Qualification Intake Department." *See Floersheim v. FTC*, 411 F.2d 874, 876–78 (9th Cir. 1969).  The CFPB submitted evidence that consumers were, in fact, deceived.  Eventually,

---

[7] The term "deceptive act or practice" has an established meaning in the context of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and Congress used very similar phrasing in § 5536(a)(1)(B).  *Compare* § 5536(a)(1)(B) (prohibiting "any unfair, deceptive, or abusive act or practice"), *with* 15 U.S.C. § 45(a) (prohibiting "unfair or deceptive acts or practices").  Accordingly, we adopt that meaning here.  *See United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter.").  Moreover, the parties both apply cases interpreting § 45(a) to inform their analysis of § 5536(a)(1)(B).

as Pessar testified, he stopped using the "Notice of HUD Rights" mailer, as callers were complaining because they thought they were getting in touch with a government agency. The only evidence Gordon submits in response are his "bald assertions" that the mailer was not deceptive, which is not sufficient to create a triable issue of fact. *Stefanchik*, 559 F.3d at 929.

Second, Gordon argues that, even if the marketing materials were deceptive, he cannot be held responsible because Pessar and his company were in charge of marketing, and Gordon had no control over the materials. An individual may be liable for corporate violations if "(1) he participated directly in the deceptive acts *or* had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 931.[8]

There is no dispute of material fact that Gordon is liable under this test, as he had control over the marketing materials and knowledge of their contents. The CFPB submitted a declaration from Pessar stating that "Gordon had final decision-making authority for all marketing used by the operation." According to Pessar's testimony, "Gordon reviewed the scripts and any marketing material used by the operation, and he edited and modified those items." The CFPB also submitted a business plan for Pessar's and Gordon's loan modification venture that stated that "Mr.

---

[8] We adopt the test for holding an individual liable for a corporation's actions used under the FTC Act. *See supra* n.7. Neither party objects to the district court's use of this test, and both apply it in their briefing to this court.

Gordon will assure that all advertising is legal." Further, the CFPB submitted testimony from John Gearries, the office manager at Gordon's law firm, stating that he believed that Gordon reviewed all the marketing materials, that Gordon approved the use of the scripts read by sales representatives, and that he had forwarded marketing materials to Gordon for his review on at least one occasion. Finally, it submitted an email from Gordon to Pessar in which Gordon states: "Mainly, as it pertains to how existing clients will be pitched, representations made to the public in marketing our services . . . my word is the law. Period."

Gordon's only attempt to dispute this evidence is his own declaration, in which he states that he had no control over marketing, was not responsible for representations made by sales personnel, and had no authority to approve or reject mailers. This "conclusory, self-serving affidavit" is insufficient to raise a triable issue of fact as to whether Gordon had authority to control advertising because it lacks "detailed facts and any supporting evidence." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *see also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015). Moreover, it is undermined because it contradicts Gordon's prior statements in his emails to Pessar. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

Third, Gordon argues the agreements that his clients eventually signed, which accurately described the services he would perform, corrected any deceptive practices in which Gordon or Pessar might have engaged. These written agreements, however, do not absolve Gordon of liability. A later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first

instance. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam) (explaining that advertising is deceptive "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract").

Finally, Gordon asserts that the representations in the advertising materials were mere "puffery." Gordon does not, however, identify any specific representations or explain why they constitute puffery. Accordingly, this argument is waived. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (finding that "a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review").

### b. Counts Four through Seven: Violations of Regulation O

In counts four through seven, the CFPB alleged that Gordon violated Regulation O by (1) receiving up-front payments for mortgage assistance relief services, (2) not making required disclosures, (3) informing consumers not to contact lenders, and (4) misrepresenting material aspects of his services. Regulation O contains several provisions that apply only to "mortgage assistance relief service provider[s]." 12 C.F.R. §§ 1015.3–1015.5. A "mortgage assistance relief service provider" is any person that provides "any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with," among other things, obtaining a loan modification or preventing foreclosure. *Id.* § 1015.2.

Gordon's only defense on these counts is that he was not a "mortgage assistance relief service provider" under the meaning of Regulation O because he did not provide the mortgage relief services at issue "in exchange for consideration."     Instead, he argues, he charged fees exclusively for "custom legal products," and the loan modification services were provided free of charge, as part of a "pro bono program." This obvious attempt to evade the requirements of Regulation O fails.  It is undisputed that Gordon's "pro bono" services were in reality in exchange for consideration, because consumers were eligible for the "pro bono" modification services only if they signed up for and paid the fees for the legal products.  Gordon suggests that this court is bound by the language in his contract, stating this his services were "pro bono," but nothing in the regulations suggest that this court must close its eyes to the facts and rely only on the contract itself to determine whether the services were actually "in exchange for consideration." *Id.* § 1015.2.

Because there is no dispute as to a material fact regarding Gordon's liability, the CFPB is entitled to summary judgment on all counts.

## D.  Remedies

Under the CFPA, the CFPB may seek various forms of relief in an enforcement action, including a permanent or temporary injunction, restitution, and disgorgement. 12 U.S.C. §§ 5564(a), 5565.  Gordon argues that the district court abused its discretion when it (1) imposed an equitable monetary judgment against him in the amount of $11,403,338.63 and (2) granted CFPB's request for injunctive relief, which prohibits Gordon from providing any mortgage assistance relief product or service for a period of three years.

### a.  Monetary Judgment

As stated above, the district court entered a $11,403,338.63 judgment against Gordon for disgorgement and restitution.  Disgorgement is a remedy in which a court orders a wrongdoer to turn over all profits obtained by violating the law.  *See SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).  A district court has "broad equity powers to order" disgorgement, and its "disgorgement calculation requires only a reasonable approximation of profits causally connected to the violation." *Id.* at 1113–14 (internal quotation marks and citation omitted).

Restitution "is a form of ancillary relief" that a court can order "[i]n the absence of proof of 'actual damages.'"  *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001).  Restitution may be measured by the "full amount lost by consumers rather than limiting damages to a defendant's profits."  *Stefanchik*, 559 F.3d at 931.  Our circuit has adopted a two-step burden-shifting framework for calculating restitution awards under the FTC Act, which the district court applied below and we apply here.  *See FTC v. Commerce Planet, Inc.*, No. 12-57064, slip op. at 17 (9th Cir. Mar. 3, 2016).  Under the first step, the government "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains."  *Id.*  A district court may use a defendant's net revenues as a basis for measuring unjust gains.  *Id.* at 18; *see also Gill*, 265 F.3d at 958 ("In the absence of proof of 'actual damages,' the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing.").  If the government makes this threshold showing, the burden shifts to the defendant to demonstrate that the net revenues

figure overstates the defendant's unjust gains. *See Commerce Planet*, slip op. at 18.

Here, the CFPB demonstrated that Gordon, Pessar, and their respective entities collected $11,403,338.63 from consumers from January 2010 through July 2012. The burden then shifted to Gordon to demonstrate that the defendants' unjust gains were less than that amount. In most of his objections to the judgment, Gordon fails to meet this burden.

First, Gordon argues that the district court should not have included fees paid by "satisfied" consumers. There is no precedent for this proposition. *See Gill*, 265 F.3d at 958 (rejecting a defendant's claim that fees paid by consumers who have benefitted from the services should be excluded from restitution because there was "no authority" for such an argument). Moreover, even if there were, Gordon fails to point to any evidence regarding which or how many consumers were "satisfied" with their services, and therefore fails to meet his burden.

Second, Gordon argues that the district court should not have included fees that he refunded to consumers. Gordon, however, failed to meet his burden to demonstrate that such amounts should be subtracted from his unjust gains because, as the district court noted, Gordon did not submit any admissible evidence that he had refunded consumers, making only the unsubstantiated statement that he has made "reimbursement[s] to dissatisfied customers." *See Stefanchik*, 559 F.3d at 931.

Third, Gordon argues that the district court should not have included fees paid by consumers who were not

persuaded by the fraudulent materials. The government, however, is entitled to the presumption that the individuals who utilized Gordon's services did so in reliance on the misrepresentations. *See Commerce Planet*, slip op. at 19; *FTC v. Figgie Int'l Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (per curiam). While this would not necessarily foreclose Gordon from presenting evidence of non-reliance, he did not do so.

Fourth, Gordon argues that the facts do not justify any monetary award against him, because Pessar was in charge of the advertising that led to counts one through three and "most of the money went to Pessar." Our precedent is clear that "[e]quity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment." *Stefanchik*, 559 F.3d at 931; *see also Commerce Planet*, slip op. at 10–11 (explaining that there is "no support in our case law" for the proposition that a restitution award "must be limited to the unjust gains each defendant personally received"). Moreover, as described above, Gordon had control over and approved the marketing materials used, and it was not an abuse of discretion for the district court to hold Gordon and his entities jointly and severally liable for the full amount. *Stefanchik*, 559 F.3d at 931–32 & n.1 (holding that there was no abuse of discretion where the district court found an individual, Stefanchik, and the corporation he solely owned, Beringer Corporation, jointly and severally liable for the full amount of sales made, despite other defendants settling, where Stefanchik and Beringer were the "driving force behind the marketing scheme").

Lastly, Gordon challenges the time period, January 2010 through July 2012, which the district court used to calculate

the monetary judgment. While his argument is unclear, Gordon appears to argue that it was improper for the district court to include the time period prior to the effectiveness of Regulation O. *See* 12 C.F.R. §§ 1015.1–11. It also appears that the relevant provisions of the CFPA were not in effect for the entire time period. *See* Dodd-Frank Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

While retroactivity of legislation and regulations is not per se unlawful, we have a presumption against retroactivity that generally requires "that the legal effect of conduct . . . ordinarily be assessed under the law that existed when the conduct took place." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (applying the presumption against retroactivity to statutes); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (applying the presumption to regulations). Although undecided in our circuit, it may be impermissible to enforce some provisions of the Dodd-Frank Act (of which the CFPA is a part and which granted the rulemaking authority that led to Regulation O, *see* 12 U.S.C. § 5512) retroactively. *See Koch v. SEC*, 793 F.3d 147, 157–58 (D.C. Cir. 2015) (addressing the issue and finding that the SEC may not use the remedial provisions of the 2010 Dodd-Frank Act to punish Koch for his conduct in 2009); *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 296–98 (6th Cir. 2015) (affirming the district court's decision not to apply a CFPB regulation promulgated under the Dodd-Frank Act and the Real Estate Settlement Procedures Act (RESPA) retroactively, agreeing that an "effective date reflects an intent not to apply it to conduct occurring prior to that date"). We vacate and remand for the district court to consider whether it is appropriate to include in its judgment against Gordon money that Gordon earned in the time period prior to

the enactment or effectiveness of Regulation O and the relevant portions of the CFPA.

### b. *Injunctive relief*

"[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). Gordon argues that the district court abused its discretion in ordering injunctive relief because it was not clear that Gordon's "wrongs [were] ongoing or likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("As a general rule, past wrongs are not enough for the grant of an injunction[.]") (internal quotation marks and citations omitted). According to Gordon, his "lack of desire and ability to continue to assist distressed homeowners in the future created a factual dispute sufficient to deny an injunction."

Assuming it applies here, the district court did not run afoul of *Evans Products*.[9] Unlike in *Evans Products*, where the district court made no finding that the defendant's misconduct was likely to recur, *see* 775 F.2d at 1088, the

---

[9] The FTC had authority to pursue the action in *Evans Products* under 15 U.S.C. § 53(b), which gives the FTC authority to pursue injunctive relief only if it can show that a person "'is violating, or is about to violate' any law enforced by the FTC; the statute does not mention past violations." 775 F.2d at 1087 (quoting 15 U.S.C. § 53(b)(1)). The provisions of the CFPA that give the CFPB authority to pursue injunctive relief do not have that same limiting language. *See* 12 U.S.C. § 5564(a) (giving CFPB authority to seek "all appropriate legal and equitable relief . . . permitted by law"); *id.* § 5565(a)(1) (giving courts "jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law").

district court specifically found that Gordon presented an ongoing risk to consumers.  This was not an abuse of discretion.  The record reflects that Gordon was continually willing to evade and complicate the investigatory process in ways that undermined his "sincere assurances" against future violations.  During the investigation, Gordon threatened the CFPB and California State Bar investigators with "lawlessness" and "anarchy."  Many similarly colorful and vaguely threatening emails followed.  The district court did not abuse its discretion in concluding that Gordon presented a risk of future harm if he immediately returned to working with distressed homeowners without limitation.

Additionally, the record reflects that the district court carefully considered the scope of the injunction and tailored it to match the risk of harm it identified and minimize the impact on Gordon's legal business.  The district court concluded that the first proposed injunction was too broad, as it contained provisions that would "unduly limit Gordon's ability to engage in lawful employment" with restrictions that lacked "any corresponding benefit to consumers."  It required the parties to meet and confer to compose a narrower injunction.  Due to its reasonable finding of future harm and its efforts to narrowly tailor the injunction, there is no basis for holding that the district court abused its discretion.

## IV.  CONCLUSION

This case requires us to decide whether an agency exists for Article III purposes when its director lacks constitutional authority to act on its behalf, similar to the age old question, "If a tree falls in a forest and no one is around to hear it, does it make a sound?"  For purposes of Article III, we believe the answer to both questions is a resounding yes.  Moreover,

because Director Cordray ratified the decision to bring the action against Gordon after his proper nomination and Senate confirmation, there is no Appointments Clause issue.

Additionally, because Gordon has failed to demonstrate that there is any dispute of material fact as to his liability under the CFPA or Regulation O, the district court properly granted summary judgment in favor of the CFPB. Further, because the district court conscientiously tailored the injunction at issue, it did not abuse its discretion in granting equitable judgment. However, because the district court may have impermissibly entered a monetary judgment against Gordon for a time period prior to the enactment or effective date of the relevant provisions of the CFPA and Regulation O, we vacate and remand for further consideration.

We **AFFIRM** in part and **VACATE AND REMAND** in part for reconsideration of the monetary judgment.

The parties shall bear their own costs on appeal.

___

IKUTA, Circuit Judge, dissenting:

Who was exercising the executive power of the United States needed to bring this civil enforcement action? Not Richard Cordray — he was not properly appointed by the President and so was not an Officer of the United States at the time the action was filed. Not the Consumer Financial Protection Bureau — without an Officer of the United States, it was a mere Congressional creation that could not exercise executive power. In fact, no one had the executive power necessary to prosecute this civil enforcement action in the

district court.  And without the Executive's power to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, no one could claim the Executive's unique Article III standing.  Because the plaintiff here lacked executive power and therefore lacked Article III standing, the district court was bound to dismiss the action.

Today the majority flouts this most basic constitutional limit to our authority by failing to give a single reason why the Bureau had standing here.  The majority's view of jurisdiction reduces to zero the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and vitiates the standing requirement's vital role in preventing "the judicial process from being used to usurp the powers of the political branches," *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)).  I decline to participate in this power grab, and therefore I dissent.

I

The plaintiff here is the Consumer Financial Protection Bureau, which was created by the Consumer Financial Protection Act in 2010.  The Act specified that the Bureau is an executive agency, 12 U.S.C. § 5491(a), and would have a director who would be "appointed by the President, by and with the advice and consent of the Senate," *id.* § 5491(b)(1)–(2).  This statutory language tracks the language of the Appointments Clause, ensuring that the Director of the Bureau is also an Officer of the United States.  U.S. Const.

art. II, § 2.[1]    The Act gave the Bureau broad powers, including the authority to commence civil litigation against any person who violates a Federal consumer financial law. 12 U.S.C. § 5564(a)–(b).

After the Act became law, President Obama appointed Richard Cordray as the Director of the Bureau under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, while the Senate was in a brief recess between two pro forma sessions.  In *NLRB v. Noel Canning*, the Supreme Court held that President Obama's appointments to the NLRB were invalid exercises of the Recess Appointment power.  134 S. Ct. 2550, 2557 (2014).  Because these appointments were made on the same day and through the same method as President Obama's appointment of Cordray to the CFPB, there is no dispute that Cordray was *not* properly appointed under the Constitution or the Act and was therefore not an Officer of the United States with executive authority. 12 U.S.C. § 5491(b)(2)–(3); *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).  The Bureau does not claim that some other person in the Bureau had the requisite executive authority of an Officer of the United States.  Of course, Cordray could not

---

[1] The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

give his subordinates executive authority that he did not possess. *See, e.g.*, *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1200 (D.D.C. 1990) ("[E]ach of the Directors could not delegate more authority than he himself had."). As explained below, this means that on July 18, 2012, when a civil enforcement action was filed against Chance Gordon and The Gordon Law Firm, P.C., neither the Bureau nor anyone in it had executive authority, and therefore the Bureau lacked standing to bring this action.

A

In order to establish standing, a plaintiff must prove "a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth*, 133 S. Ct. at 2661 (citing *Lujan*, 504 U.S. at 560–61). An "injury to the interest in seeing that the law is obeyed" does not suffice to satisfy the standing inquiry, at least when the person suing is a private citizen. *See FEC v. Akins*, 524 U.S. 11, 24 (1998).

Enforcement actions brought by the Executive satisfy the requirements of Article III for purposes of a federal court's subject matter jurisdiction. The Constitution imposes on the President the duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and an important component of that duty is obtaining criminal convictions for violations of law in federal court, *see United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982), as well as enforcing and defending federal law in civil suits, *see, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution

entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)). The Executive has a unique need to access the federal courts in order to fulfill this constitutional responsibility for ensuring that public rights are enforced, and such an executive enforcement action is a "Case" or "Controversy" that satisfies Article III. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 n.4 (1998) (confirming that the Court's standing jurisprudence "derives from Article III and not Article II," even when it has "an impact on Presidential powers"). Therefore, federal courts have jurisdiction over such executive actions under Article III. *See In re Debs*, 158 U.S. 564, 586 (1895) (holding that when the government acts to enforce public rights, "the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts").

There is only one way for a plaintiff to obtain the Executive's Article III standing to enforce public rights in federal court: the plaintiff must be vested with executive authority. The Constitution vests the executive power "in a President of the United States of America." U.S. Const. art. II, § 1. The President may authorize others to exercise executive authority pursuant to the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, which requires the President to appoint principal officers with the "Advice and Consent" of the U.S. Senate.**²** *See Buckley*, 424 U.S. at 125–27. Because the Appointments Clause provides "the only authorization for appointment of those to whom

---

**²** Inferior officers may be appointed by the President alone, the heads of departments, or the judiciary, as Congress may determine, but it is undisputed that no inferior officer was involved in the civil enforcement action here.

substantial executive or administrative authority is given by statute," *id.* at 124–25, any person exercising significant executive authority must "be appointed in the manner prescribed" by that clause, *id.* at 126. A person properly appointed would thus have standing to file suit in vindication of public rights. *Id.* at 126, 140.

We know that Cordray was not properly appointed by the President and therefore did not have any authority to enforce public rights. As a result, Cordray lacked the Executive's unique Article III standing.

And without Cordray, or any properly appointed Officer of the United States, the Bureau lacked any executive authority that would allow it to enforce public rights. Contrary to the majority, Maj. op. at 13–14, Congress cannot by itself confer executive authority to bring a civil enforcement action on an entity created by statute. *See Buckley*, 424 U.S. at 137–38. In *Buckley*, the Court considered a provision in the 1974 Amendments to the Federal Election Campaign Act (FECA) that empowered the Federal Election Commission (FEC) to file civil enforcement suits. *Id.* at 6, 111. Because FECA gave Congress the right to appoint a majority of the FEC's members, *id.* at 126–27, *Buckley* held that the FEC could not exercise the FECA's grant of enforcement power or conduct civil litigation. *Id.* at 137–40. Only the President and persons who are "Officers of the United States" could do so. *Id.* at 139–40. *Buckley* therefore struck down the provisions in FECA "vesting in the [FEC] primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." *Id.* at 140. In light of *Buckley*'s reasoning, the Act's statement that the Bureau is an Executive Branch agency is not enough to give the Bureau the Executive's enforcement

authority. *Cf.* Maj. op. at 13–14. As a result, the Bureau did not have the Executive's unique Article III standing.[3]

If neither Cordray nor the Bureau had standing, then no one before the district court in this case had Article III standing to bring this action against Gordon and his law firm.[4] Since Article III standing is assessed at the time an action is filed and must be met throughout all stages of litigation in the federal courts, *Hollingsworth*, 133 S. Ct. at 2661, the district court had a duty to determine whether the Bureau had standing before ruling on the enforcement action. *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1070 (9th Cir. 2014) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Because the requirements of Article III were not satisfied when the Bureau filed this action, the district court was obliged to dismiss it for want of subject matter jurisdiction. We are now required to do the same. *Hollingsworth*, 133 S. Ct. at 2659.

B

The majority fails to even address how a Bureau with no executive power has standing to bring a civil enforcement

---

[3] Nor can Congress confer the Executive's unique Article III standing to private individuals. *See Lujan*, 504 U.S. at 573–74 (holding that Congress cannot confer the Executive's standing to enforce public rights on private individuals through "citizen-suit" provisions); *see also Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772–74 (2000) (holding that private individuals can assert the federal government's interests in a *qui tam* suit because they have their own pecuniary interest as partial assignees of the government's pecuniary claim).

[4] Neither Richard Cordray nor the Bureau allege any injury in fact that would otherwise provide standing under Article III.

action. Instead of providing reasoning, the majority merely makes the conclusory statement that the Bureau is "part of the Executive Branch," Maj. op. at 14, which does not explain the source of the Bureau's executive power. The majority then points to two cases rejecting Appointments Clause claims as "nonjurisdictional." Maj. op. at 15. But these cases give the majority no support because neither addressed the issue of standing. The first case, *Freytag v. Commissioner*, addresses only the question whether a court should entertain an argument that had not been raised below. *Freytag* ruled that a statute authorizing the Chief Judge of the Tax Court to assign any proceeding to a special trial judge did not violate the Appointments Clause. 501 U.S. 868 (1991). As a preliminary housekeeping matter, the Court held that it could consider the appellants' Appointments Clause objection to the judicial officer for the first time on appeal because such objection was "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Id.* at 878–79. Because there was no dispute that the petitioners (who had been ordered to pay taxes owed to the federal government) had suffered a concrete and particularized injury, this case did not raise any question regarding standing and therefore provides no support to the majority's theory that the court has jurisdiction to hear a claim brought by a plaintiff who lacks the Executive's unique Article III standing to bring an enforcement action.

Nor did the majority's second authority, *Buckley*, hold that a court has jurisdiction over a civil enforcement action brought by someone who lacks standing. *See* Maj. op. at 15–16. Of course, *Buckley* did not address the FEC's standing at all, and thus has no precedential effect on this issue. *See Steel Co.*, 523 U.S. at 91. Moreover, contrary to

the majority, *Buckley* did not hold that the FEC could bring civil enforcement actions at a time when it lacked the Executive's enforcement authority. Maj. op. at 16. Rather, the Court accorded de facto validity only to the FEC's past administrative actions and legislative determinations that were analogous to the powers that Congress could delegate to one of its own committees. *Buckley*, 424 U.S. at 142. Specifically, the Court held that the FEC's inability to exercise enforcement powers "because of the method by which its members have been selected" did not "affect the validity of the Commission's *administrative actions and determinations* to this date, including its administration of those provisions, upheld today, authorizing the public financing of federal elections" and so those "past acts of the Commission are therefore accorded *de facto* validity, just as we have recognized should be the case with respect to *legislative acts* performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan." *Id.* (emphasis added); *see also id.* at 137.

Indeed, at the time the Court ruled, it appears that the FEC had not yet even exercised its enforcement authority. As *Buckley* explained, the D.C. Circuit had ruled that it could not address the constitutionality of the FEC's enforcement authority because it was not yet ripe for resolution. *Id.* at 115 n.157; *see also Buckley v. Valeo*, 519 F.2d 821, 893 (D.C. Cir. 1975) ("No party has been joined in a civil enforcement action initiated by the Commission."). The Court disagreed with the D.C. Circuit on the ripeness issue, but only because by that time, the FEC "ha[d] undertaken to issue rules and regulations," and "[w]hile many of its other functions remain[ed] as yet unexercised, the date of their all but certain exercise [was] now closer by several months than it was at the time the Court of Appeals ruled." 424 U.S. at 116–17.

Based on these and other statements in *Buckley*, it is clear that the FEC had not undertaken any enforcement action at the time the Court ruled (or at least, the Court did not know of any), and therefore we cannot infer that the Court accorded de facto validity to such actions.[5]

Because *Freytag* and *Buckley* are inapposite and did not address the standing issue before us here, the majority has no support for its conclusion that the Bureau has standing to bring a civil enforcement action to enforce the Act. Instead of explaining why the Bureau has standing under Article III, the majority instead claims that the Bureau's standing to bring a civil enforcement action is not affected by the President's failure to appoint Cordray under Article II and accuses the dissent of conflating Article II and Article III. Maj. op. at 15. But this is backwards. The improper appointment of Cordray merely deprived the Bureau of one basis for standing. In most cases, an executive agency has Article III standing because it has a director properly vested with executive authority under Article II, but it is undisputed that the Bureau cannot claim standing on this basis. So the real question is: what is the alternative basis for the Bureau's standing? Instead of providing one, the majority merely reiterates that Congress enacted a statute stating that the Bureau is part of the Executive Branch. Maj. op. at 14. But Congress cannot confer executive authority to bring a civil enforcement action on an entity created by statute, *see*

---

[5] The majority cites *Legi-Tech* for the proposition that the D.C. Circuit interpreted *Buckley* as retroactively validating civil enforcement actions brought by an improperly constituted FEC. Maj. op. at 16. This is mistaken: *Legi-Tech* held that a *properly* constituted FEC had the authority to continue an enforcement action, and did not address any standing issue. *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996).

*Buckley*, 424 U.S. at 137–38, so this rationale fails. In sum, the majority offers no explanation for the Bureau's standing because it has none.

II

Because Article III standing must exist at the time a complaint is filed, Richard Cordray's August 30, 2013, ratification could not retroactively cure the district court's lack of jurisdiction.

Federal courts have consistently rejected arguments that a later act can cure a lack of standing at the time suit was filed. Thus, where a plaintiff files a complaint before its asserted injury occurred, it lacks standing even if a sufficient injury-in-fact occurs while the case is pending. *See Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 110 (2d Cir. 2013) ("[W]e hold that the Rule 15(c) 'relation back' doctrine does not permit members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims that were dismissed from the class complaint for want of jurisdiction."); *Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094, 1101 & n.6 (10th Cir. 2006) (holding that "[b]ecause standing is determined as of the time of the filing of the complaint," the plaintiff's alleged subsequent injury could not serve as a basis for standing). Similarly, the intervention of a party with standing after an action has been filed "cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action." 7 Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 1917 (3d ed. 2005); *see also Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 160–62 (2d Cir. 2012) ("[I]f jurisdiction is lacking at the commencement of a suit,

it cannot be aided by the intervention of a plaintiff with a sufficient claim." (alterations omitted)).

At the time the Bureau filed this enforcement action, it had no standing because it had no executive authority to vindicate the public interest in federal court. While the President subsequently properly appointed an Officer of the United States to the position of Director, who could then constitutionally bring an enforcement action, that official could not retroactively cure the Bureau's lack of standing. *Cf. FEC v. NRA Political Victory Fund*, 513 U.S. 88, 90, 98–99 (1994) (holding that the Solicitor General's ratification of an unauthorized petition for certiorari could not cure a failure to meet the "mandatory and jurisdictional" 90-day deadline to file a petition).

III

Because the Bureau lacked standing when it brought this enforcement action, we lack jurisdiction. This conclusion undoubtedly applies to numerous other enforcement actions taken by the Bureau for the 18 months of its existence before Richard Cordray was properly confirmed by the Senate in July 2013. But while the Supreme Court understands the practical consequences of invalidating large numbers of agency actions, it has nevertheless done so when the law requires. *See Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013), *aff'd* 134 S. Ct. 2550 (2014) (holding that because there was no quorum of validly appointed board members, the NLRB "lacked authority to act," and the enforcement order was therefore "void *ab initio*"); *see also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687–88 (2010); *id.* at 689 (Kennedy, J., dissenting) ("Under the Court's holding, the Board was unauthorized to resolve the

more than 500 cases it addressed during those 26 months in the course of carrying out its responsibility . . . .").

We likewise have a duty to dismiss this case for lack of Article III jurisdiction, practical effects notwithstanding. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). The limitations imposed by Article III may not be swept aside for "the sake of convenience and efficiency." *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Because the majority ignores these fundamental limits to our Constitutional authority, I dissent.