FILED

AUG 03 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos.   AZ-17-1280-FSBa |
| | AZ-17-1292-FSBa |
| ERIK SAMUEL DE JONG and DARYL LYNN DE JONG, | (Cross-Appeals) |
| | |
| Debtors. | Bk. No.   2:14-bk-00886-PS |
| | |
| ERIK SAMUEL DE JONG; DARYL LYNN DE JONG, | |
| | |
| Appellants/Cross-Appellees, | |
| | |
| v. | OPINION |
| | |
| JLE-04 PARKER, L.L.C., | |
| | |
| Appellee/Cross-Appellant. | |

Argued and Submitted on June 21, 2018
at Phoenix, Arizona

Filed – August 3, 2018

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Paul Sala, Bankruptcy Judge, Presiding

Appearances:     Michael Warren Carmel argued on behalf of appellants/cross-appellees Erik Samuel de Jong and Daryl Lynn de Jong; Kiersten Ann Murphy of Henze Cook Murphy, PLLC argued on behalf of appellee/cross-appellant JLE-04 Parker, L.L.C.

Before: FARIS, SPRAKER, and BASON,[*] Bankruptcy Judges.

FARIS, Bankruptcy Judge:

## INTRODUCTION

Chapter 11[1] debtors Erik Samuel de Jong and Daryl Lynn de Jong (collectively "Debtors") refused to vacate appellee JLE-04 Parker, L.L.C.'s ("JLE") property for a period of months following termination of their lease. Instead, they continued their profitable dairy operation. After a trial, the bankruptcy court awarded JLE damages based on disgorgement of the relevant portion of the Debtors' net profits plus the value of silage, a form of cow feed, which the Debtors' cows consumed after the lease terminated. The court separately calculated the damages that accrued before and after the Debtors filed their bankruptcy petition.

---

[*] The Honorable Neil W. Bason, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

2

This Panel affirmed the bankruptcy court's judgment except for the portion of the damages that consisted of the value of silage consumed during the postpetition period. On remand, the bankruptcy court deducted that portion from the total damages.

Both sides are dissatisfied.

The Debtors argue that the bankruptcy court should have also reduced the damages by the value of silage consumed during the prepetition period, even though the Panel did not address this point. We reluctantly agree. In the first appeal, the Debtors argued at length that the postpetition silage damages were improper; they only challenged the prepetition silage damages in a single terse footnote. As a result, this Panel's prior decision was silent about the prepetition silage damages, and our silence misled the bankruptcy court. We perceive no reason why the prepetition and postpetition silage should be treated differently, and we will adjust the judgment accordingly.

JLE cross-appeals, arguing that the bankruptcy court too narrowly followed the Panel's mandate and incorrectly calculated the other elements of damages. We agree in part. Our mandate did not preclude the bankruptcy court from recalculating all damages on remand. We agree with one of JLE's contentions about the award.

We therefore REVERSE and REMAND for entry of judgment in the amount set forth below. We publish to clarify the rule of mandate.

## FACTUAL BACKGROUND[2]

### A.    Prepetition events

The Debtors operated a dairy farm on real property (the "Property") owned by Sonora Desert Dairy, LLC. In May 2013, Sonora Desert Dairy, which was a debtor in a separate bankruptcy case, informed the Debtors that their lease would terminate on November 30. Separately, a foreclosure sale of the Property was set for December 6. Despite reminders that they needed to vacate the Property, the Debtors failed to do so.

Around this time, the Debtors inquired about moving their operation to another farm owned by Brian Van Leeuwen (the "Van Leeuwen Property"), but they learned that there was not enough room for all of the cows. The Debtors were also worried about the silage inventory, which they claimed would be worthless if they had to relocate.

JLE purchased the Property at the December 6 foreclosure sale, but the Debtors refused to leave, insisting that the lease entitled them to stay on the Property. JLE filed a forcible entry and detainer proceeding ("FED Action") in state court against the Debtors.

### B.    Bankruptcy events

The day before a scheduled trial in the FED Action, the Debtors filed a chapter 11 petition. The bankruptcy court later modified the automatic

---

[2] For a more comprehensive background, see *de Jong v. JLE-04 Parker, LLC (In re de Jong)*, BAP No. AZ-16-1337-JuLB, 2017 WL 2417189 (9th Cir. BAP June 2, 2017).

stay to allow the state court to hold the trial and determine the Debtors' right to possession. It also ordered JLE not to pursue a writ of restitution or otherwise enforce the judgment and prohibited JLE from removing or repossessing livestock, personal property, or feed on the Property without further order from the bankruptcy court.

Following trial, the state court found that the nonjudicial foreclosure of the deed of trust terminated the Debtors' leasehold interest, such that the Debtors remained on the property "without any right to be there."

JLE then asked the bankruptcy court to compel the Debtors to vacate the Property. The bankruptcy court ordered the Debtors to vacate the Property by June 1, 2014.[3]

JLE filed a proof of claim for over $8.8 million in damages arising from the Debtors' trespass. It sought damages measured mostly by the disgorgement of the Debtors' profits and its own lost profits.

By May 31, 2014, the Debtors had removed all of their cows from the Property. They relocated their dairy operation to the Van Leeuwen Property, including approximately 2,000 cows, but had to sell at auction 1,405 cows that could not fit on the smaller property.

The parties filed cross-motions for summary judgment on the issue of

---

[3] Following the court's ruling, Mr. de Jong sent a text message to one of JLE's creditors, bragging that he got exactly what he wanted from the bankruptcy court and that he was "making a sh**load of money off his cows." 2017 WL 2417189 at *5.

the Debtors' trespass. The bankruptcy court ruled that the state court's judgment (that the Debtors were trespassers) was entitled to issue preclusive effect and also independently found that the Debtors were trespassers under Arizona law.

JLE filed an administrative claim for $7.9 million based on the Debtors' postpetition trespass and moved for summary judgment. The bankruptcy court granted the motion in part as to the unlawful trespass. However, the court denied summary judgment as to whether the trespass was intentional and the extent to which the Debtors benefitted from the trespass.

In November 2015, the bankruptcy court held a trial to determine whether the Debtors' trespass was conscious and the appropriate measure of damages.

The bankruptcy court found that the Debtors were conscious trespassers after the foreclosure sale on December 6, 2013. It held that the Debtors were liable to JLE for the benefits that the Debtors received from wrongfully staying on the Property. The court decided that the Debtors realized two benefits from their retention of the Property: first, they earned additional net profits from keeping a larger herd at the Property than they could have maintained at the Van Leeuwen Property; and second, they used silage that would otherwise have gone to waste.

To calculate net profits, the bankruptcy court began with the Debtors'

6

draft financial statement which indicated that the Debtors' net income for the first six months of 2014 was $2,762,587. (In doing so, it rejected JLE's argument that the court should use the monthly operating reports to determine net income.) The court adjusted this amount to reflect that the relevant period for purposes of damages was December 6, 2013 to May 31, 2014.

The bankruptcy court then subtracted the Debtors' profit realized from the sale of the cows ($1,050,835), because the court determined that the Debtors would have earned the same profit even if they had not remained on the Property after the lease was terminated. The total net profit was $1,711,752.

The court prorated the net profits between the prepetition period and the postpetition period based on the number of days in each period (forty-seven days and 128 days, respectively).

Finally, the court further reduced the net profits component of the damages by about sixty percent because the Debtors could have moved about sixty percent of their herd to the Van Leeuwen Property and made a corresponding profit. The court explained that:

> The Debtors directly benefitted to the extent they profited from being able to use the 1405 cows that they could not use on the Van Leeuwen Property; their likely and eventual business home. Where the Debtors owned 3538 cows on the petition date, those 1405 cows made up 39.71% of their herd. **Thus, 39.71% of the net profits generated by the Debtors['] dairy**

7

**operations were a direct benefit from their trespass.**

(Emphasis added.) In other words, the bankruptcy court concluded that 39.71 percent of the Debtors' net profit represented the additional benefit that they gained from wrongfully trespassing on the Property, in excess of what they would have earned had they not trespassed and instead moved their cows to the Van Leeuwen Property. According to the court, only that portion of their total profit needed to be disgorged.

Next, the bankruptcy court turned to the amount of silage that the Debtors owned and used. The bankruptcy court reasoned that the silage should be included in the benefits received by the Debtors from their trespass because Mr. de Jong testified that moving the silage would have ruined it. Therefore, "the Debtors benefitted from the use of what would otherwise have been worthless silage . . . ."

The court calculated that the Debtors used an average of $8,864.34 of silage per day, based on available data for an overlapping period. The court calculated that the Debtors used $416,623.98 of silage during the prepetition trespass and $1,134,635.52 of silage during the postpetition trespass.

The bankruptcy court totaled the silage and profit amounts.[4] It then reduced the award by the prorated amounts that the Debtors paid in pre-

---

[4] The bankruptcy court rejected JLE's claims for lost opportunities, cost of restoration, annoyance/discomfort, fair market rental value, and punitive damages.

and postpetition rent and taxes. It concluded that JLE's prepetition damage claim was $558,716.24 and its postpetition administrative claim was $1,517,069.64.

The bankruptcy court later entered an amended award ("Amended Damages Order") that reduced the credit for the amount of rent paid to correspond with its proration of the additional "benefit" received by the Debtors from their trespass: "to ensure that the Debtors do not receive a duplicative credit for rent paid, the amount of the rent paid that would not be attributable to JLE's disgorgement damages (60.29%) should be credited to reduce JLE's damages award." It thus laid out its final calculations as follows:

Pre-petition
Pre-petition silage             $416,623.98
Pre-petition profits[5]         $191,541.45
Pre-petition hay conversion   $720.00
      Subtotal                              $608,885.43
Credit for 60.29% of pre-petition rent     ($29,812.92)
($49,449.19 x .6029)
      **Total pre-petition claim**          **$579,072.51**

Post-petition
Post-petition silage           $1,134,635.52

---

[5] These are profits from the **additional** 1,405 "cows that [the Debtors] could not have used in their operations had they not trespassed on JLE's property."

| | |
|---|---|
| Post-petition profits[6] | $521,644.79 |
| Subtotal | $1,656,280.31 |
| Credit for 60.29% of post-petition rent ($139,930.67 x .6029) | ($84,364.20) |
| **Total post-petition claim** | **$1,571,916.11** |

## C.    The first BAP appeal

The Debtors appealed from the bankruptcy court's Amended Damages Order. They argued that the bankruptcy court erred by: applying issue preclusion to the state court's findings in the FED Action; independently deciding that the Debtors were trespassers; finding that the Debtors were conscious trespassers; and applying an incorrect measure of damages that exceeded the fair market rental value of the Property.

The Debtors also contended that the bankruptcy court improperly calculated JLE's postpetition damages. They argued that the bankruptcy court erroneously counted silage as a profit, when in actuality it was an operating cost. As such, the value of the silage could not be awarded to JLE.

The BAP affirmed the bankruptcy court in all respects except for the last damages issue. It held that the bankruptcy court erred in calculating the postpetition profits by "double counting" the silage:

> This double-counting occurred because the court took the amount of silage used in the relevant time period and added

---

[6] *See* footnote 5, *supra*.

10

that figure to a portion of the net income derived from its profits gained from operating a larger dairy operation on JLE's property. Debtors argue that it was error to include both items in the measure of restitution. Debtors also contend that the court's analysis of the amount of silage utilized by Debtors during their occupancy is not a proper method to calculate "profits" since it is an expense item. We agree.

2017 WL 2417189, at *13. The BAP thus instructed the bankruptcy court to recalculate the postpetition damages:

> The proper measure of recovery in this case must be the benefits, or net profits, received by Debtors from the wrongful use of JLE's property. Net profit is the business's gross revenues less any operating expenses. An operating expense would include the silage that was bought by Debtors to feed their cows, including the extra cows that Debtors kept on the property by virtue of their wrongful trespass. Debtors did not generate a direct profit, or benefit, by use of the silage after their trespass. Instead, they simply avoided a loss of something that they had already paid for. Nonetheless, their purchase of the silage was a legitimate operating expense because it was fed to the cows which generated the profits that accrued to Debtors as a direct result of their wrongful trespass. **Accordingly, the bankruptcy court erred by considering the silage as a separate component of damages which resulted in overstating and double counting the wrongfully obtained profits.** Therefore, we vacate the bankruptcy court's postpetition damage award and remand for a calculation of damages consistent with this memorandum.

*Id*. at *14 (emphasis added).

11

## D.   Proceedings on remand

On remand, the bankruptcy court recalculated JLE's damages by eliminating the line item for postpetition silage damages. The court also called attention to its award of prepetition silage damages. It noted that the BAP's decision specifically concerned postpetition damages only, despite the rationale for awarding silage damages being the same across both pre- and postpetition periods. It indicated that it might be appropriate to eliminate the prepetition silage award but that it was constrained by the BAP's directive.[7]

Accordingly, the bankruptcy court issued its order ("Order After Remand") holding that JLE was entitled to a prepetition claim of $579,072.51 and a postpetition administrative claim of $437,280.59, as follows:

Pre-petition
| | | |
|---|---|---|
| Pre-petition silage | $416,623.98 | |
| Pre-petition profits | $191,541.45 | |
| Pre-petition hay conversion | $720.00 | |
| Total | | $608,885.43 |
| Credit for 60.29% of pre-petition rent ($49,449.19 x .6029) | | ($29,812.92) |
| **Total pre-petition claim** | | **$579,072.51** |

Post-petition

---

[7] The bankruptcy court noted that the BAP's decision "specifically refers to **postpetition** profits in at least five instances[.]"

| | | |
|---|---|---|
| Post-petition silage | $0 | |
| Post-petition profits | $521,644.79 | |
| Total | | $521,644.79 |
| Credit for 60.29% of post-petition rent ($139,930.67 x .6029) | | ($84,364.20) |
| Total post-petition claim | | **$437,280.59** |

The Debtors filed a timely notice of appeal from the Order After Remand. JLE filed a timely notice of cross-appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

(1) Whether the bankruptcy court erred by not subtracting the prepetition silage value from the damages award.

(2) Whether the bankruptcy court erred by not revising its calculation of net profits.

## STANDARDS OF REVIEW

We review de novo whether the bankruptcy court used the correct legal standard in computing damages. *See Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1119 (9th Cir. 2000). De novo review is independent and gives no deference to the trial court's conclusions. *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 915 (9th Cir. BAP 2013).

We also review de novo a whether the trial court complied with an appellate mandate on remand. *See E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 758 F.3d 1162, 1170 (9th Cir. 2014); *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007) ("[I]f a district court errs by violating the rule of mandate, the error is a jurisdictional one."). We review for abuse of discretion the trial court's decision to consider an issue on remand that the mandate does not foreclose. *See Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012) (holding, under an abuse of discretion standard, that the district court on remand "did not violate the law of the case [when considering a issue on remand that] . . . had never been considered or decided by any court"); *Carter v. Astrue*, 295 F. App'x 868, 869 (9th Cir. 2008) (holding that "[t]he district court acted within its discretion in construing the remand order" to allow introduction of new evidence); *Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) ("Absent a mandate explicitly or impliedly precluding amendment, the decision whether to allow leave to amend is within the trial court's discretion.").

We also review for an abuse of discretion the bankruptcy court's "grant of equitable monetary and injunctive relief." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified

14

the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (en banc).

The bankruptcy court's "computation of damages is a finding of fact we review for clear error." *Simeonoff v. Hiner*, 249 F.3d 883, 893 (9th Cir. 2001). A finding of fact is clearly erroneous if it is illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003).

## DISCUSSION

**A.    The bankruptcy court should have removed the silage costs from the prepetition damages award.**

The Debtors' only argument in this appeal is that the bankruptcy court should have removed the prepetition silage value from the award in the Order After Remand.[8] The Debtors argue that they "merely strive for consistency in the manner in which damages are calculated. If the silage

---

[8] The Debtors submit a lengthy opening brief but admit that they are only reiterating their arguments raised in the earlier appeal in order to preserve the arguments for further appellate review. Accordingly, we do not consider those issues.

15

usage expense should be excluded for post-petition profits, it should similarly be reduced for pre-petition profits." This requires us to consider the extent to which our mandate was binding on the bankruptcy court.

Under the "rule of mandate," the trial court must adhere to the appellate court's decision: "'The rule of mandate is similar to, but broader than, the law of the case doctrine.' The rule provides that any 'district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it.'" *Stacy v. Colvin*, 825 F.3d 563, 567-68 (9th Cir. 2016) (citations omitted). The trial court "commits 'jurisdictional error' if it takes actions that contradict the mandate." *Id.* at 568 (citing *Hall*, 697 F.3d at 1067).

Nothing in the BAP's mandate compelled the bankruptcy court to disturb its prepetition silage damages award. As the bankruptcy court correctly noted, the BAP specified in multiple instances that it was vacating the postpetition damage award and did not refer to prepetition damages.[9]

---

[9] This is consistent with the overwhelming emphasis of the Debtors' arguments before the prior Panel. The Debtors' opening brief mentioned postpetition profits or damages at least seven times. Only a single terse footnote at the end of the opening brief made reference to the prepetition silage award: "The Court utilized the same methodology in calculating Appellee's pre-petition claim of $579,072.51. The Court's calculations of the Pre-Petition disgorgement/silage usage is reversible error for the same reasons Appellants appeal the Court's calculation of the amount awarded for the Post-Petition Administrative claim." Moreover, the Debtors did not mention prepetition silage at oral argument. On remand, they admitted to the bankruptcy court that they did not focus the Panel's attention on the issue of prepetition damages.

Accordingly, the Order After Remand was consistent with the BAP's mandate.

The rule of mandate, however, does not **prohibit** the trial court from addressing issues that were **not** decided by the appellate court or made a part of the mandate. The Ninth Circuit has stated that the trial court "may, however, 'decide anything not foreclosed by the mandate.'" *Id.* (quoting *Hall*, 697 F.3d at 1067). It noted:

> We have previously allowed district courts to reexamine any issue on remand that is not inconsistent with the mandate. *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995). To illustrate, in *Odima* we remanded with instructions to make specific findings concerning an employer's reasons for not promoting the plaintiff. *Id.* On remand, the district court did as we directed but also reevaluated and expanded upon the remedies available to the plaintiff. *Id.* We held the district court was free to revisit the issue of remedies on remand because "any issue not expressly or impliedly disposed of on appeal [is] available for consideration by the trial court on remand." *Id.* (quoting *Firth v. United States*, 554 F.2d 990, 993-94 (9th Cir. 1977)).

*Id.*; *see Hall*, 697 F.3d at 1067 ("[W]hen a court is confronted with issues that the remanding court never considered, the 'mandate[ ] require[s] respect for what the higher court decided, not for what it did **not** decide.'" (quoting *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000))).[10]

---

[10] As an authoritative treatise explains:

(continued...)

This Panel's prior decision was simply silent on the question of the prepetition silage. Nothing in the Panel's reasoning implies that the prepetition silage should be included in the damages award but the post-petition damages should not. Because the BAP did not consider or decide the propriety of the prepetition silage award, the bankruptcy court had discretion to reexamine that award upon remand.

The bankruptcy court thought, however, that this Panel's prior decision precluded it from changing its prepetition damages award. In this respect, we think that the bankruptcy court was led astray by the lacuna in our prior decision (and that the prior Panel was led astray by the Debtor's decision to bury their discussion of the issue in a single brief footnote). Therefore, we are constrained to say that the bankruptcy court misunderstood its powers under the rule of mandate, applied an incorrect legal standard, and abused its discretion by declining to consider a

[10](...continued)
Focus on the mandate rule is desirable only if its requirements are met— **if the appellate court in fact did not consider and resolve an issue not presented on the first appeal, the trial court acting on remand should not be bound as tightly as if the issue had in fact been resolved.** The trial court should take account of the needs of orderly progression through the trial and appeals processes in deciding whether to reconsider its own pre-appeal ruling, but so long as further proceedings are otherwise appropriate on remand **there is no point in pretending that the trial court owes fealty to a nonexistent appellate ruling**.

18B Wright, Miller & Cooper, *Federal Practice and Procedure:  Jurisdiction 2d* § 4478.6 (2002) (emphases added).

18

modification of the prepetition silage award.

We agree with the Debtors that striking the prepetition silage award is appropriate. The prior BAP Panel held that the postpetition silage award was an operating expense, not a part of the Debtors' net profit; this logic applies equally to prepetition silage.

Fortunately, the bankruptcy court foresaw the possibility of our conclusion and made a finding about the value of the prepetition silage. Therefore, rather than remanding the case again, we will simply strike the silage value ($416,623.98) from the prepetition damage award in the Amended Damages Order. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1310 (9th Cir. 1990) ("Our exercise of this discretion [to recalculate an award prior to remand] is particularly appropriate where recalculation involves issues that we are equally situated to decide."); *Felder v. United States*, 543 F.2d 657, 671 (9th Cir. 1976) ("Most of the changes we have made involved arithmetical calculations that we could perform as easily as the trial court and a remand would necessarily have involved a waste of judicial resources.").

## B.    The bankruptcy court erred in calculating net profits.

On its cross-appeal, JLE argues that the bankruptcy court failed "to follow both the letter and the spirit" of the BAP's earlier decision because the Panel directed the court to calculate damages as the gross revenue less expenses. JLE contends that, on remand, the bankruptcy court erred by

19

failing to recalculate the profits using "the Panel's formula (the entire business's gross profits less expenses)[.]" We disagree with most of JLE's contentions, but we hold that our mandate did not constrain the bankruptcy court as tightly as it thought and that the court should have made one adjustment to its calculation of net profits.

1. **JLE did not waive its arguments on cross-appeal by failing to raise them in the first BAP appeal**.

In the first appeal, JLE fully supported the bankruptcy court's damages calculation. This raises the question whether JLE may attack that calculation for the first time in this second appeal.

As a general rule, an appellant may not raise issues in a second appeal that it failed to raise in a prior appeal:

> By waiting to raise the argument after the first appeal, defendants required the district court and plaintiff to deal with the case again and have forced our court to deal with a second appeal. **We do not condone and cannot encourage that inefficient and uneconomical approach. Defendants knew everything they needed to know** about their joint and several liability for the attorney fee award **at the time of the prior appeal. If they wanted to challenge the joint and several liability, they should have done so at that time.** They did not, so the challenge has been waived.

*Jimenez v. Franklin*, 680 F.3d 1096, 1100 (9th Cir. 2012) (emphases added); *see Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 468 F. App'x 676, 678 (9th Cir. 2012) ("To the extent that defendants attempt now to raise new arguments .

20

. . , those matters could have and should have been raised in the initial appeal. Because they were not, they are waived."); *United States v. Nagra*, 147 F.3d 875, 882 (9th Cir.1998) ("When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter."); *Munoz v. Cty. of Imperial*, 667 F.2d 811, 817 (9th Cir. 1982) ("[D]efendants . . . are now raising a new issue that they did not raise in their last appeal to this court. We need not and do not consider a new contention that could have been but was not raised on the prior appeal.").

All of these cases hold that an **appellant** in the first appeal may not raise brand new arguments in a second appeal. The remaining question is whether an **appellee** may do so. Here, the case law is less clear. The Ninth Circuit has held that defendant/appellees "did not need to take a cross appeal in the prior appeal in order to argue, as an alternative ground for affirming the judgment, that they had qualified immunity" in a second appeal following remand. *Rivero v. City & Cty. of S.F.*, 316 F.3d 857, 862 (9th Cir. 2002). Courts in other circuits have reached mixed conclusions. *See* 18B Wright, Miller & Cooper, *Federal Practice and Procedure:  Jurisdiction 2d* § 4478.6 (2002) ("some decisions allow renewal on remand of questions that the appellee did not raise on an earlier appeal, while other decisions bar renewal"); *compare Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740 (D.C. Cir. 1995) ("While there are clear adjudicative efficiencies created by requiring appellants to bring all of their objections to a judgment in a single

appeal rather than *seriatim . . .* , forcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation."), *with Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1294 (Fed. Cir. 2013) (agreeing with appellant that "the district court erred by allowing [appellee] to address validity on remand despite its failure to file a cross-appeal from the adverse final judgment" in the first appeal), *and Kessler v. Nat'l Enterprises, Inc.*, 203 F.3d 1058, 1059-60 (8th Cir. 2000) (dismissing cross-appeal for failure to raise arguments in earlier appeal).

We hold that JLE's decision to support the judgment in the first appeal does not preclude it from challenging the damages calculation in this appeal. The bankruptcy court awarded JLE less than it wanted, but JLE was apparently willing to live with the reduced award. It is easy to say, knowing what we know now, that it would have been more efficient if JLE had raised all of its arguments in the first appeal. But we have the benefit of hindsight, and we cannot expect an appellee like JLE to have perfect foresight. To require an appellee to raise all possible challenges to a damages award, even if the appellee is willing to live with the result, would expand the scope of many appeals, increasing the burden on appellants, appellees, and appellate courts. And because the vast majority of appeals result in affirmance, that additional effort and expense would be

wasted in most cases.

In this case, the BAP substantially altered the dollar amount of the judgment. The BAP thus "lessened" JLE's rights under the Amended Damages Order, which then allowed it to challenge other portions of the damages award in this second appeal. *See Rivero*, 316 F.3d at 862 ("If the court of appeals agrees with the plaintiff-appellant and alters the judgment in some way, it provides relief that was not provided by the district court, and thereby 'enlarges' the rights of the plaintiff-appellant and 'lessens' the rights of the defendant-appellee.").

Accordingly, JLE did not waive its arguments by failing to raise them in the first appeal.

### 2. The Panel's mandate did not preclude the bankruptcy court from recomputing the lost profits damages.

JLE contends that the Panel's mandate in the prior appeal required the bankruptcy court to revisit its calculation of lost profits. In contrast, the bankruptcy court believed that our mandate precluded it from doing so. We disagree with both JLE and the bankruptcy court. The mandate did not require the bankruptcy court to recompute the profits, and also did not preclude the court from doing so.

The Panel said that "[t]he proper measure of recovery in this case must be the benefits, or net profits, received by Debtors from the wrongful use of JLE's property." 2017 WL 2417189, at *14. The Panel affirmed the

23

court's use of "a restitutionary measure of damages, including the disgorgement of profits." *Id.* at *13. Thus, nothing in the Panel's prior decision required the bankruptcy court to recompute the damages.

On the other hand, nothing in the Panel's decision prevented the court from doing so either. The prior Panel did not reach the issue of whether the bankruptcy court's calculations of net profits were correct. JLE correctly points out that, if the Panel intended to preclude such a reassessment, the Panel could have simply struck the postpetition silage award rather than remanding the case. Therefore, the bankruptcy court was free to revisit that issue on remand.

The bankruptcy court incorrectly thought that our mandate precluded it from recalculating the profits. Thus, the bankruptcy court misapprehended its powers and applied an incorrect legal standard on remand.

**3. The bankruptcy court erroneously reduced the disgorgement award by the hypothetical profits that the Debtors could have earned without trespassing on the Property.**

JLE contends that the bankruptcy court erred in awarding only a portion of the Debtors' net profits during the trespass period. We agree that the bankruptcy court's measure of damages was incorrect in one respect.

The Ninth Circuit has recognized that "[d]isgorgement is a remedy in which a court orders a wrongdoer to turn over all profits obtained by

violating the law. A district court has broad equity powers to order disgorgement, and its disgorgement calculation requires only a reasonable approximation of profits causally connected to the violation." *Gordon*, 819 F.3d at 1195 (internal citation and quotation marks omitted).

As we noted in our previous decision, the bankruptcy court did not err by using a restitutionary measure of damages, including disgorgement of net profits. 2017 WL 2417189, at *13. We also stated that net profits are determined by subtracting operating costs from gross revenues. *Id.* at *14.

But the bankruptcy court did not award all of the net profits that the Debtors earned while trespassing on JLE's property. Instead, it reduced the net profits by 60.29 percent, because the Debtors could have moved 2,133 of their 3,538 cows to the Van Leeuwen Property and earned a profit there. This reasoning suffers from a fatal logical flaw; it impermissibly capped the calculation of net profits. As JLE argues, if the Van Leeuwen Property were large enough to accommodate the Debtors' entire herd, the bankruptcy court's formula would find that the Debtors received no "benefit" from trespassing on the Property. That a trespasser could have earned some or all of those profits without trespassing does not negate the fact that these net profits were earned by trespassing.[11] Therefore, the Debtors were

---

[11] The Restatement (Third) of Restitution and Unjust Enrichment instructs that the trial court should apportion the net profits between the wrongdoer's lawful and unlawful activities:

(continued...)

required to disgorge all of their net profits earned during the trespass.

Fortunately, we need not remand again for calculation of damages. The bankruptcy court has already determined the daily net profits, and we are persuaded that those calculations are consistent with the methodology we outlined in the prior appeal (the bankruptcy court apparently thought so too, because, unlike its two alternative silage calculations, it did not offer any alternative calculation of daily net profits).

As we have noted above, the bankruptcy court's calculation of the Debtors' net profits started with $2,762,587 net income for the first six months of 2014 (those six months are not coterminous with the period of trespass, but they largely overlap and appear to be the closest period of reliable data presented to the court). The bankruptcy court then deducted

---

[11](...continued)
When the net profit in question has been realized in part as a result of the wrong to the claimant and in part from the defendant's legitimate activities—so that some part, at least, of the defendant's profit would have been realized in the absence of the wrong—what proportion of the net profit is attributable to the wrong to the claimant? Because precise answers to this part of the apportionment problem are often unattainable, the court will reach the best approximation it can under the circumstances.

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. g (Am. Law Inst. 2011). While apportionment may be appropriate in other circumstances, such as where "the underlying wrong to the claimant affects only one" component of the defendant's business, *id.*, in this case, apportionment is unnecessary. The Debtors' wrongful trespass affected and enabled their entire dairy business, not a mere component of a larger enterprise. As such, the entire benefit that the Debtors gained is attributable to the wrongful trespass on the Property and must be disgorged.

the Debtors' profit from the sale of the cows ($1,050,835), because that profit was not shown to have resulted from the trespass, to arrive at net profit of $1,711,752 for that six month period. Next, the bankruptcy court recognized that the Debtors' profits were not necessarily spread out evenly during the half-year period, so the bankruptcy court compared milk sales during the trespass portion of 2014 (January 2014 through May 2014) with milk sales after the trespass ended (June 2014), and determined that 90.56 percent of the net profits were earned during the trespass period from January 1 through May 31, 2014 – *i.e.*, $1,550,162.61 in net profits ($1,711,752 x 90.56%). Then the bankruptcy court converted this figure to a daily net profit amount: it divided the total of $1,550,162.61 by the number of days from January 1 through May 31, 2014 (151 days, including the start and end days). This yields a daily net profit of $10,262.98 ($1,550,162.61/151 days).[12] Because the herd size did not change between the 2014 trespass period and the December 2013 trespass period, the court used the same daily net profit figure for December 2013, so the daily net profit throughout the entire trespass period was $10,262.98. Neither party has established any clear error in the court's determination of daily net profits.

We convert these daily net profits into total profits below.

---

[12] We cannot verify the bankruptcy court's arithmetic concerning the daily net profit. Nevertheless, the parties do not challenge this figure, and JLE urges us to adopt the $10,262.98 daily net profit calculation, so we do not disturb this calculation.

Meanwhile, we note that, as the bankruptcy court recognized, any damages must be reduced to account for rent and taxes that the Debtors paid. Because we reject the bankruptcy court's proration of the net profits, we also do not prorate the credit for rent and taxes paid that the court applied to offset the damages award. Accordingly, we subtract $49,449.19 (rather than $29,812.92) from the prepetition damages and $139,930.67 (rather than $84,364.20) from the postpetition damages.

4. **We reject JLE's other points of error, with one minor exception.**

JLE raises other arguments related to the calculation of profits and urges us to increase the damages award accordingly. With one minor exception, we decline to do so.

First, JLE argues that the bankruptcy court should have calculated the Debtors' profits using the monthly operating reports, rather than the draft financial statement. But the bankruptcy court thoroughly explained its reasons for rejecting the monthly operating reports, which it found to paint an incomplete picture of the Debtors' finances. We discern no clear error.

JLE also argues in passing that the bankruptcy court should have awarded it the profits that the Debtors realized from the sale of the 1,405 cows. We find no error. There was no evidence that the profit gained from the sale of the cows was tied to the wrongful trespass. For example, there is no evidence that the cows gained value during the period of the trespass.

28

Regarding the number of days pre- and postpetition, we disagree with JLE's argument that they are entitled to forty-eight post-trespass/prepetition days. The court awarded net profits for forty-seven days, which excludes the date of the foreclosure sale and continues through the day before the Debtors filed their petition. JLE does not provide any evidence that we should count the entirety of December 6, 2013 as a compensable trespass day. The bankruptcy court counted the days of trespass beginning the following day, and we find no clear error with its calculation.

However, we agree with JLE's assertion that the bankruptcy court miscounted the number of postpetition/post-trespass days. The period from January 23, 2014 to May 31, 2014 is 129 days inclusive of the petition date and the end date. We adjust the postpetition net profits calculation by an additional day.

Finally, JLE contends that the trespass period lasted until June 15, 2014, not May 31. But the bankruptcy court found that the Debtors had vacated the Property by May 31 as it had ordered, and we discern no clear error. Although some machinery and equipment remained on the Property until June 15, there is no dispute that the Debtors removed the cows by May 31. Disgorgement is based on the profits earned while the Debtors wrongfully remained on the Property, and the Debtors were no longer earning money from the Property after May 31. The bankruptcy court was

correct to order disgorgement of profits only until May 31.

## CONCLUSION

For the foregoing reasons, we REVERSE the bankruptcy court's Order After Remand as to (1) the award of prepetition silage, (2) the pre- and postpetition net profits calculation, (3) the proration of the rent credits, and (4) the number of postpetition days used in the net profits calculation. With these four modifications, the prepetition claim and postpetition administrative claim are adjusted as follows:

<u>Pre-petition</u>

| | | |
|---|---|---|
| Pre-petition silage | $0 | |
| Pre-petition profits | $482,360.06 | |
| (47 days @ $10,262.98/day) | | |
| Pre-petition hay conversion | $720.00 | |
| Subtotal | | $483,080.06 |
| Credit for 100% of pre-petition rent | | ($49,449.19) |
| **Total pre-petition claim** | | **$433,630.87** |

<u>Post-petition</u>

| | | |
|---|---|---|
| Post-petition silage | $0 | |
| Post-petition profits | $1,323,924.42 | |
| (129 days @ $10,262.98/day) | | |
| Subtotal | | $1,323,924.42 |
| Credit for 100% of post-petition rent | | ($139,930.67) |
| **Total post-petition claim** | | **$1,183,993.75** |

We REMAND for entry of judgment in the foregoing amounts.